7 F.3d 233
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Kathryn M. HALL, Plaintiff-Appellant;
v.
Nicholas G. MENEDIS, Defendant-Appellee.
 No. 92-3572.
 United States Court of Appeals, Sixth Circuit.
 Sept. 22, 1993.
 
 Before: KEITH and JONES, Circuit Judges; and PECK, Senior Circuit Judge.*
 PER CURIAM.
 
 
 1
 Plaintiff-Appellant Kathryn M. Hall appeals the district court's judgment for Defendant-Appellee Nicholas G. Menedis in this Title VII action. We affirm.
 
 
 2
 * and
 
 
 3
 Kathryn Hall, an African-American woman, brought Title VII claims against Nicholas Menedis, Executive Director of the Ohio State Employment Relations Board (SERB). She claims (1) SERB did not hire her as a Labor Relations Specialist in June 1989 because of her race and gender; (2) SERB did not hire her as a Labor Relations Specialist in January 1990 because of her race; and (3) SERB did not hire her as the Cleveland, Ohio, Regional Office Manager in February 1990 because of her gender.
 
 
 4
 On July 8, 1991, the district court granted in part and denied in part SERB's motion for summary judgment. It dismissed two supplemental state law claims, not at issue here, but did not dismiss any of the Title VII claims. The Title VII claims went to trial in May, 1992, and on May 15 the district court entered judgment in favor of SERB. Hall now appeals from that judgment.
 
 B
 
 5
 SERB is a state agency that governs public sector collective bargaining in Ohio. Its duties include designating appropriate public sector collective bargaining units, conducting representation elections, and investigating, prosecuting, and hearing charges of unfair labor practices. SERB consists of a three-member Board appointed by the Governor of Ohio. The Board appoints an Executive Director to oversee the daily operations of the agency.
 
 
 6
 Menedis, the appellee, succeeded John R. Looman as Executive Director in March 1991. Looman had served in the role since mid-May 1988. During Looman's tenure, SERB operated three offices, a central office in Columbus and two regional offices in Cleveland and Cincinnati. Each regional office was headed by a regional manager and staffed by at least one Labor Relations Specialist, whose job it was to investigate charges of unfair labor practices.
 
 
 7
 The Ohio Department of Administrative Services (DAS) is a state agency responsible for monitoring state agencies to ensure compliance with the state's affirmative action requirements. DAS investigated SERB in 1988 and issued its findings in a Monitoring Report. The Report found that SERB had no affirmative action plan in effect, and that SERB employees noted instances of racial discrimination within SERB, including racial discrimination in hiring practices. DAS recommended that SERB establish an affirmative action plan, hire an equal opportunity officer, and hire racial minorities as managers and supervisors.
 
 
 8
 Looman appointed Joseph Morris, an African-American Labor Relations Specialist, as SERB's new Equal Employment Opportunity Officer in September 1988. Morris developed SERB's affirmative action plan in 1989. Morris also developed and reviewed all questions asked to job applicants prior to their use.
 
 
 9
 Shortly after Looman's arrival, two Labor Relations Specialist positions became vacant. A four-person panel interviewed selected candidates. The panel consisted of Looman, Jeffrey Taylor, the Administrator of Investigation, Nancy Sutter, the Administrator of Representation, and Geraldine Garros, the Cleveland Regional Office Manager. All panelists were caucasian.
 
 
 10
 Based on the panel's recommendations, SERB hired two African-American women, Michelle Lindsey and Kathry Hunter, to fill the Labor Relations Specialist positions. A management position, Head of Research Training, also opened. Looman appointed Cherry Alexander, an Asian-American female, to the post upon the interview panel's recommendation.
 
 
 11
 In May 1989, another Labor Relations Specialist position opened. The appellant applied for the job along with twenty-seven other persons. The panel selected her along with Joseph Eck, Amy Hughes, and four other applicants for interviews.
 
 
 12
 The minimum qualifications for the position were listed as (a) an undergraduate degree in labor relations, business, personnel administration, or public administration; (b) course work in oral and written communication and human relations; and (c) two or more years experience in a related field as a substitute for academic experience. The preferred qualifications included (a) several years experience in public sector labor relations matters or (b) experience as an investigator; and (c) good writing skills. All applicants had to submit writing samples.
 
 
 13
 Hall graduated from college with a Bachelor of Arts degree in political science, pre-law, and criminal justice. She served as a field representative, investigator, and supervisor at the Ohio Civil Rights Commission (OCRC). As a supervisor of investigators, Ms. Hall had responsibility for training investigators as to the laws and regulations of the Equal Employment Opportunity Commission and the OCRC and for conciliating charges of discrimination. In that capacity, it was appellant's duty to ensure compliance with Ohio's civil rights statutes. Appellant submitted six writing samples prepared by her during her employment with the OCRC.
 
 
 14
 Eck is a white male. He graduated from the University of Akron with a Bachelor of Science in Labor Economics and a Master's Degree from Ohio State University in Labor and Human Resources. Eck completed his Master's requirements by interning at SERB. SERB had signed him to an additional ten-week contract when he applied for the Labor Relations Specialist position. As his writing sample, Eck submitted a twenty-seven page report he wrote as part of his internship with SERB.
 
 
 15
 Hughes is a white female. She graduated from Muskingum College with a degree in business. She also earned a paralegal certificate. Hughes had worked at SERB as a clerical specialist since October 1988. She served as an assistant to SERB's General Counsel, and her primary duties included photocopying and filing. She submitted a paper on capital punishment as her writing sample.
 
 
 16
 On the day of the interview, Eck and Hughes shared a car with Looman, Sutter, and Taylor, all members of the interview panel. Eck also listed Taylor as a reference on his application. During the interview, the panelists asked each applicant the same questions, all of which had been pre-screened and approved by Morris, the EEO Officer, under guidelines established by the State Division of EEO.
 
 
 17
 After the interviews, the panelists convened to discuss the candidates. The appellee claims that while the panel thought Hall was a good candidate, it believed that Eck was better because of his experience and performance as an intern at SERB. Further, Sutter found two of Hall's writing samples objectionable. Those writing samples were memoranda regarding the attendance of one of her subordinates. Sutter objected to the appellant's not having protected the confidence of the subordinate by blacking out his name and to appellant's focus on the subordinate's attendance record rather than his investigative skills. Sutter concluded that the memoranda showed a lack of judgment.
 
 
 18
 Appellant claims that the panelists treated her candidacy differently than the other applicants. She claims that the panelists evaluated only one of her six writing samples. Further, she says the panelists evaluated the one writing sample for substance rather than for writing skills as they did with the other candidates.
 
 
 19
 Morris objected to the panel's selection of Eck and voiced concern than SERB needed to hire additional racial minorities. Nevertheless, SERB hired Eck to fill the May 1989 Labor Relations Specialist position.
 
 
 20
 In November 1989, another Labor Relations Specialist position became available. Approximately thirty-five people applied for the position. The interview panel selected ten candidates for interviews, including the appellant and Hughes. This panel consisted of Looman, Taylor, Sutter, and Morris.
 
 
 21
 Sutter objected to inviting appellant to the interview, expressing concern that the memoranda in question during the first interview demonstrated her lack of judgment. The panelists agreed to invite her again provided she explain the nature of the memoranda. Appellant argues that since the November position did not require writing samples, questioning her about a prior writing sample was inappropriate. She also claims that Sutter was hostile to her during the interview regarding the memoranda. However, the appellee points out that Taylor stated that he did not perceive Sutter's demeanor as hostile.
 
 
 22
 After the interviews, Looman expressed his preference for the appellant. Morris also supported her, and he voiced concern about panelists who placed too much weight on her prior writing samples. Taylor, however believed the appellant had exercised poor judgment during a role play in the interview. Taylor supported Hughes for the position. The panel ultimately voted to recommend Hughes, whom SERB hired to fill the Labor Relations Specialist position.
 
 
 23
 In January 1990, a Regional Office Manager position opened. Forty-two persons applied for the job, including the appellant. She was not re-interviewed but was considered. Among those who were interviewed were three African-American men, and one African-American woman. SERB hired Tony Shields, an African-American man.
 
 II
 
 24
 Appellant first claims that we should review de novo the district court's findings of fact and law because that court failed to apply a correct legal principle in its deliberation. Specifically, she claims that the court failed to apply strict scrutiny in analyzing the subjective elements of SERB's articulated reason for not hiring her, which she believes was a pretext for race and gender discrimination.
 
 
 25
 Under Rule 52 of the Federal Rules of Civil Procedure, we cannot set aside specific findings of fact unless they are clearly erroneous. However, this deferential standard does not apply to conclusions of law or factual findings resulting from the application of incorrect legal principles. Woolridge v. Marlene Indus. Corp., 875 F.2d 540, 545 (6th Cir.1989). Thus, we could review this case de novo to determine if the district court failed to apply the appropriate level of scrutiny. Upon review, we hold that the court did not make this error.
 
 
 26
 * Hall argues that the appropriate standard of review by the district court is "strict scrutiny." This circuit has applied "close scrutiny" in this area. As we have written, "the legitimacy of the articulated reason for the employment decision is subject to particularly close scrutiny where the evaluation is subjective and the evaluators themselves are not members of the protected minority." Henry v. Lennox Indus., Inc., 768 F.2d 746, 751 (6th Cir.1985) (citation omitted). Under Lennox Industries, this case may demand close scrutiny due to the composition of the evaluators and the subjectivity of the reasons for rejection of the applicant.
 
 
 27
 As an African-American woman, Hall was evaluated mostly by persons who were not of her race or gender. When Hall interviewed for the May 1989 Labor Relations Specialist position, none of the four interviewers was African-American, though one member of each of the subsequent panels was. The last two panels included only one woman each. Also, the various reasons that the review panels used for rejecting her include some that are subjective, such as the belief that one of her writing samples showed a lack of judgment. But even when a district court closely scrutinizes a case, that does not mean that employers cannot use subjective reasons in selecting employees. "The use of subjective criteria is permissible in the selection of management positions. However, 'the ultimate issue in each case is whether the subjective criteria were used to disguise discriminatory action.' " Farber v. Massillon Bd. of Educ., 917 F.2d 1391, 1399 (6th Cir.1990) ( quoting Grano v. Dept. of Dev. of Columbus, 699 F.2d 836, 837 (6th Cir.1983)), cert. denied, 111 S.Ct. 2851 (1991).
 
 
 28
 The district court was convinced that the defendant's reasons for its hirings were nondiscriminatory. J.A. at 441. In hiring Eck for the May 1989 position, SERB concluded that he met all the requirements for the position and had demonstrated his capabilities while working as a SERB intern. In hiring Hughes for the November 1989 position, SERB decided that she met the minimum requirements and the interviewers were familiar with her recent SERB performance and her intiative. Finally, for the Regional Office Manager position, SERB interviewed three black men and one black woman as finalists, hiring one of the men whose performance in an interview role play they considered the best they had ever seen.
 
 
 29
 The district court did not spell out what legal standard it applied to the subjective elements of SERB's decision not to hire the appellant. Under Woolridge, 875 F.2d at 545, however, "[t]he court is not required to articulate in detail the legal principles from which its conclusions are drawn." Here, the court found not only that the defendant had articulated legitimate nondiscriminatory reasons for the hirings, but that "overwhelming" evidence established that race and gender did not harm Hall in the hiring process. J.A. at 441. After a review of the proceedings, we hold that the district court did apply close scrutiny in reviewing the legitimacy of the reason for the hirings.
 
 B
 
 30
 Our confidence in the district court's analysis is bolstered by our substantive review of the record, which, we note, does not demonstrate that SERB's reasons for hiring the relevant persons were pretexts for racial discrimination. The standard for pretext is set forth in Sims v. Cleland, 813 F.2d 790, 792 (6th Cir.1987):
 
 
 31
 A plaintiff can establish that the legitimate, nondiscriminatory reason for the employment decision articulated by the defendant employer is pretextual in one of two ways. The first is to establish by a preponderance of the evidence that the discriminatory reason was the true reason motivating the employer's conduct. Alternatively, the plaintiff can prove pretext by showing that the proffered legitimate reason was false."
 
 
 32
 The plaintiff may also prove pretext through direct or statistical evidence. Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804-05 (1973).
 
 
 33
 There is no claim in this case that SERB's proffered reasons for not promoting Hall are false, and Hall simply has not shown that the reasons are pretexts for discrimination based upon her race or gender. She points out that SERB hired two caucasians for the two Labor Relations Specialist positions, and two men for the first Labor Relations Specialist position and the Regional Manager Officer position. She does not address the facts that SERB hired two African-American women for the two Labor Relations Specialist positions open prior to the ones for which she applied, that SERB hired an Asian-American woman for the first management position open under Looman's tenure, and that SERB hired an African-American male for the next management position that opened.
 
 
 34
 Moreover, despite negative findings by DAS in 1988, SERB implemented all of DAS's major recommendations under Looman's guidance. SERB hired an African-American male to become EEO Officer. SERB developed and implemented an affirmative action plan and hired two racial minorities for the management positions that became available. SERB had all interview questions pre-screened and approved by its EEO Officer. In 1990, a DAS monitoring report stated that SERB successfully meets overall State EEO employment goals.
 
 
 35
 Given this background, the various particular complaints that appellant makes about the SERB interview panels' reasoning do not, in our view, prove that the reasons are pretexts. SERB did not conclusively disclose discriminatory motivations by reviewing the substance of the memorandum Hall submitted as a writing sample, nor did it do so by focusing on only one of the six writing samples she submitted. The "in house" advantage given to Eck and Hughes, who worked for SERB before being hired for the Labor Relations Specialist positions, does not prove discriminatory intent, particularly since SERB has also given that advantage to two African-American females by promoting them from Labor Relations Specialist to higher positions. J.A. at 733. Nor did Sutter evidence discrimination by carrying over her negative impression of Hall's memorandum into the second job interview in question.
 
 III
 
 36
 Even assuming the district court applied the correct standard of review, appellant argues that the court's factual determinations were clearly erroneous. See Fed.R.Civ.P. 52(a). Reviewing for clear error means that "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985); Woolridge, 875 F.2d at 542. In light of our review of the record as expressed above, we cannot find clear error in the determinations below.
 
 IV
 
 37
 For the foregoing reasons, we hold that the district court applied "close scrutiny" to the subjective elements of SERB's reasons for not hiring the appellant for the three positions for which she applied, and that the record provides no evidence that the district court's decision was clearly erroneous. The district court's judgment is AFFIRMED.
 
 
 
 *
 Hon. John W. Peck, senior circuit judge, deceased on September 7, 1993