76 F.3d 378
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Lois D. DeVAULT, Plaintiff-Appellant,
v.
BOEING DEFENSE & SPACE-OAK RIDGE, INC., Defendant-Appellee.
 No. 94-6273.
 United States Court of Appeals, Sixth Circuit.
 Jan. 23, 1996.
 
 Before: BOGGS and DAUGHTREY, Circuit Judges; and MATIA, District Judge.*
 PER CURIAM.
 
 
 1
 In this sex discrimination case, the plaintiff, Lois D. DeVault ("DeVault"), appeals from the judgment of the district court contending that it erred in concluding that she failed to carry her ultimate burden of proof that the defendant, Boeing Defense & Space-Oak Ridge, Inc. ("Boeing"), violated Title VII when it failed to reappoint her to a supervisory position in its Assembly Department. For the reasons stated below, we AFFIRM the judgment of the district court.
 
 I.
 
 2
 Boeing is a wholly owned subsidiary of The Boeing Company, a manufacturer of commercial and military aircraft. In 1979, Boeing entered into an agreement to manufacture centrifuge machines at Oak Ridge with the United States Department of Energy ("DOE"). Boeing developed its Oak Ridge facilities and commenced operations there in 1981. Four years later, DOE terminated the centrifuge program. From 1985 until late 1986, many of Boeing's hourly employees were engaged in closing out the project. Meanwhile, the Oak Ridge operations were sustained by Boeing's parent corporation, which assigned aircraft parts work to Oak Ridge from its Everett and Renton plants in the Seattle, Washington area and from its plant in Wichita, Kansas.
 
 
 3
 DeVault was employed by Boeing on April 19, 1982, as an hourly paid production employee in the company's centrifuge program at Oak Ridge, Tennessee. Her work was performed in the Assembly Department. In the Assembly Department, supervisors supervised 15-to-20-member crews or teams. On August 1, 1986, DeVault was made a temporary supervisor in the Assembly Department and that assignment became permanent on September 19, 1986.
 
 
 4
 In the middle of 1988, the Wichita Plant took back some of the parts assembly work that had been assigned to Oak Ridge. The Factory Manager of the Oak Ridge Plant testified that the decision was based on the facts that the Oak Ridge plant was chronically behind schedule and the quality of the work being performed at that plant was not acceptable. The loss of the Wichita parts work was the major factor in two 1988 reductions in force ("RIF") at the Oak Ridge plant. The first of these was in September 1988. The Oak Ridge plant cut 35 hourly jobs and eight salaried positions. The Assembly Department lost three supervisory positions. While the supervisors were terminated, through exercise of their seniority rights under the Collective Bargaining Agreement between Boeing and the International Association of Machinists they were able to continue work as hourly employees. DeVault was not directly affected by the September reduction. In October 1988, the Assembly Department lost another three supervisors, each of whom returned to the hourly work force. DeVault was among them.
 
 
 5
 Boeing had transferred Frank Hopper to the Oak Ridge plant in May 1988 because of the serious problems it was experiencing. Hopper's job as a General Supervisor was to rectify the performance problems and turn the performance of the Assembly Department around.
 
 
 6
 The selection of supervisors for layoffs in the September and October 1988 layoffs was based on assessment of each employee's performance. This assessment took the form of a "totem," that is, a ranking of the supervisors. Totems were prepared in March and September. The September RIF was based on the March totem. The October RIF was based on a totem prepared in September. DeVault was ranked next to last on this totem.
 
 
 7
 Before the October 1988 layoff, there had been two Assembly Department crews on the second shift. One was supervised by Joe Parks, the other by Drew Colwell. Almost immediately after the October 1988 RIF Colwell suffered a heart attack and died. This left the second shift without a supervisor because the former supervisor of the other crew on the second shift, Joe Parks, had just been returned to the second shift hourly work force in the October 1988 RIF as a lead person. In October 1988, Parks was made an acting supervisor on the second shift, and the position became permanent in February 1989. The decision to reappoint Parks was made despite his ranking below DeVault on the totem. Three hourly employees were promoted to supervisory positions within the 300-day period prior to the filing of the EEOC charge by DeVault (stipulated to have been filed on November 17, 1989).
 
 II.
 
 8
 To begin, the parties disagree on the correct standard of appellate review of the district court's decision. Apparently, DeVault claims that this appeal involves a mixed question of law and fact and that, therefore, this court may undertake an independent review "as there is no presumption of correctness." (Appellant's Brief at 11) Boeing argues that the issue on appeal is whether the finding of the district court that Boeing did not intentionally discriminate against DeVault on the basis of her sex is clearly erroneous.
 
 
 9
 When a case is tried to the court without a jury, the standard of appellate review is "clearly erroneous" as to findings of fact and "de novo" as to matters of law. Anderson v. City of Bessemer City, N.C., 470 U.S. 564 (1985); Woolsey v. Hunt, 932 F.2d 555, 563 (6th Cir.1991). In Title VII discrimination cases, findings as to intentional discrimination must be reviewed under the "clearly erroneous" standard. Pullman-Standard v. Swint, 456 U.S. 273 (1982); Anderson, supra. That this is appropriate in this case is apparent even from DeVault's formulation of the underlying issue: "that the District Court erred in its holding by failing to consider adequately the overwhelming evidence presented in the Appellant's favor that the 'legitimate business reasons' given for the Appellee's failure to re-promote the Plaintiff were merely pretextural [sic]." (Appellant's Brief at 10) (Emphasis added.) A court's consideration and weighing of the evidence is clearly factual. Therefore, the judgment of the district court will not be disturbed unless it is clearly erroneous.
 
 III.
 
 10
 The principles governing the burden of proof in Title VII cases are well settled and are set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981). First, the plaintiff must prove a prima facie case of discrimination. If the plaintiff is successful, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the plaintiff's rejection. If the defendant carries this burden, the plaintiff then has an opportunity to prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. Throughout this process, it is essential to remember that the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff never leaves the plaintiff.
 
 
 11
 It is not difficult to establish a prima facie case of discrimination, and the district court found that DeVault had indeed produced the requisite proof. (Joint Appendix at 37-39) Boeing does not seriously dispute this finding.
 
 
 12
 After finding that DeVault had established a prima facie case of sex discrimination, the district court proceeded to examine whether the reasons proffered by Boeing were legitimate and nondiscriminatory or whether they were, in fact, only a pretext for discrimination.
 
 
 13
 Boeing's evidence showed that DeVault was ranked next to the bottom in a subjective rating of front line supervisors ("FLS"). This rating, or totem, was prepared twice yearly and was used as a guide to determine which salaried employees were to be retained in the event of a RIF. One's rank on the totem was essentially the subjective opinion of various management personnel. DeVault was the only female FLS in Boeing's Assembly Department. DeVault's supervisor testified that DeVault's next-to-last rating was based upon her inability to provide estimated completion times for particular job orders, her refusal to discuss this situation with him, and her marginal crew leadership ability due to her limited understanding of drawings. Another Boeing witness testified that DeVault's crew had excessive scratch marks on the aircraft parts it was assembling, causing these assembled parts to be rejected at a time when quality was of great significance. This witness testified that DeVault was unable to "slow down" to accommodate the need for quality as well as quantity on the assembly line.
 
 
 14
 The crux of DeVault's discrimination claim involves the filling of a vacancy in a FLS position that opened up upon the severe illness (and, later, death) of a FLS. DeVault and the men immediately above her and below her on the totem had been downgraded from FLS to hourly crew workers due to a RIF. When the FLS position suddenly opened up thereafter, Boeing named Joe Parks, the male ranked below DeVault, as acting supervisor (later made a permanent position). DeVault's supervisor, Frank Hopper, testified that he made the selection on the basis of Parks' firsthand knowledge of the ongoing work of that crew, since he had been the lead employee of that crew since his downgrading. The district court specifically found that this testimony was credible. (Joint Appendix at 26) It should also be noted that there was testimony that this man was ranked lower on the totem than DeVault solely because of a drinking problem, which had been ameliorated.
 
 
 15
 DeVault also claims discrimination in the promotion of three male hourly employees to supervisory positions in the Assembly Department. Boeing's evidence showed that one of these males had been the lead employee for two years, understood the drawings related to the crew's work, and was clearly the best qualified candidate. Another male had twice served as an acting supervisor, was also the lead employee, and was involved in efforts to increase efficiency. The third male was not promoted but was transferred into the department. The district court specifically found this testimony to be credible. (Joint Appendix at 26) The district court further found that DeVault's testimony and demeanor on the witness stand actually supported Boeing's assessment of her lack of communication skills and leadership qualities. (Joint Appendix at 32-33 and 41)
 
 
 16
 This Court has observed that " '[w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demand even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.' " Wooldridge v. Marlene Industries Corp., 875 F.2d 540, 543 (6th Cir.1989) (quoting Anderson, 470 U.S. at 575). The instant appeal does not present a situation where the district court relied on testimony that simply cannot be believed. Further, these credibility judgments are particularly the domain of the district court. Accordingly, the district court did not err in crediting Boeing's evidence and concluding that DeVault had failed to prove that defendant's articulated reasons for not reappointing her were pretextual.
 
 IV.
 
 17
 In summary, DeVault has not convinced this Court that the district court's decision is clearly erroneous. Boeing has filled the record in this case with articulated, nondiscriminatory reasons for its employment decisions. DeVault has failed to prove that the reasons put forth by Boeing are pretextual. Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Paul R. Matia, United States District Judge for the Northern District of Ohio, sitting by designation